REITLER KAILAS & ROSENBLATT LLP
Brian D. Caplan
Julie B. Wlodinguer
885 Third Avenue, 20th Floor
New York, NY 10022
Phone: (212) 209-3050
Fax: (212) 371-5500
Email: bcaplan@reitlerlaw.com
Email: jwlodinguer@reitlerlaw.com
*Attorneys for Plaintiff Curtain Call Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| CURTAIN CALL LIMITED, | Case No. 25-cv-1561 |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| ISLAND RECORDS, a DIVISION OF UMG RECORDINGS, INC., | Plaintiff Demands A Trial By Jury |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Curtain Call Limited, by its attorneys, Reitler Kailas & Rosenblatt LLP, as and for its Complaint against defendant Island Records, a division of UMG Recordings, Inc., alleges as follows:

### THE PARTIES

1.      Plaintiff Curtain Call Limited ("Plaintiff" or "Curtain Call") is a foreign corporation organized under the laws of Ireland.

2.      Upon information and belief, defendant Island Records is a division of UMG Recordings, Inc. ("Defendant" or "Island Records") which is a corporation organized under the

laws of California with principal offices for the conduct of its business located in the State of California.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

4.      Venue lies in this district pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the claims herein occurred in the Southern District of New York, and at the time of commencing this action, Defendant has offices for the conduct of business within the County and State of New York and regularly conducts business there. Defendant is therefore subject to personal jurisdiction in the Southern District of New York.

5.      Venue and personal jurisdiction are also proper in this District pursuant to the terms of written agreements entered into between the parties wherein the parties agreed to the exclusive jurisdiction of New York courts over this action.

## BACKGROUND

6.      Plaintiff Curtain Call was formed in 1989 as a loan out corporation to provide the music recording services of Dolores O'Riordan, Noel Hogan, Mike Hogan and Fergal Lawler collectively p/k/a "The Cranberries."

7.      On or about July 31, 1991, Curtain Call and Island Records entered into an exclusive recording agreement ("the 1991 Agreement").

8.      On or about April 25, 1995, Curtain Call and Island Records entered into an additional recording agreement ("the 1995 Agreement").

9.      On or about November 12, 1998, Curtain Call and Island Records entered into another additional recording agreement ("the 1998 Agreement") (the 1991, 1995 and 1998

2

Agreements as amended will be collectively referred to hereinafter as the "Recording Agreements").

10.    Pursuant to the Recording Agreements, Island Records obtained, among other things, certain rights to master recordings embodying the recorded performances of the members of the Cranberries (the "Masters") and exclusive rights to commercially exploit the Masters, in exchange for which Island Records was obligated, among other things, to account to and pay Curtain Call certain royalty payments.

11.    Pursuant to the terms of the Recording Agreements, Island Records was to provide Curtain Call with semi-annual statements concerning its exploitation of the Masters and royalties payable to Plaintiff.

12.    Clause 7(i) of the 1991 Agreement states:

> *"In the event that Island licenses Masters for use on a flat-fee basis (i.e., otherwise than on the basis of a royalty based on the price of records), including any synchronization licenses for the use of Masters, you [Curtain Call] shall be entitled to fifty percent (50%) of the net proceeds received by Island from any such license in lieu of any royalty otherwise payable."*

13.    Clause 1(r) of the 1991 Agreement defines "net proceeds" as:

> *"Island's gross monies received less any out-of-pocket costs, expenses or payments which Island is required to make to third parties including, but not limited to, payments to a trustee or fund to the extent required by an agreement with any labor organization or trustee, mechanical royalty payments and taxes (other than income taxes)."*

14.    In or about December 2019, Plaintiff engaged the accounting firm of Prager Metis to conduct an audit of the books and records of Defendant with respect to its exploitation of the Masters, and the royalties payable to Plaintiff which resulted therefrom, for the time period January 1, 2017 through June 30, 2021 (the "Audit Period").

15.    As a result of the audit, and given the information provided them, Prager Metis issued a report dated September 1, 2021 (the "Audit Report").

16.    As set forth in the Audit Report, Prager Metis concluded that Plaintiff was underpaid royalties for the Audit Period, including, without limitation, the following:

(a) $1,500,774 with respect to the underpayment of foreign streaming income of which, upon knowledge and belief, $1,213,959 is in respect of Masters and $286,815 is in respect of Videos (as such term is defined at paragraph 32 hereof); and

(b) $8,748 with respect to the application of incorrect royalty rates.

17.    As part of the examination, Prager Metis reviewed the amounts reported as collected by Island Records with respect to the streaming service Spotify. Prager Metis found that the per unit amounts collected from foreign territories were lower than the amounts collected in the United States from domestic exploitation.

18.    Upon further inquiry, Island Records disclosed that royalties from foreign streams are paid to Plaintiff based upon 60% of the revenue received by Island Records' foreign distributors.

19.    Upon information and belief, Island Records distributes the Masters in foreign territories through related and affiliated companies, and a 40% charge is deducted by such foreign distributor or licensee as an internal inter-company charge.

20.    Ostensibly, the fees charged by a foreign distributor and/or licensee are intended to cover the costs of marketing, promotion, and distribution of master recordings in foreign territories.

21.    However, in the modern era of digital streaming, the tasks of marketing, promotion and distribution of master recordings are not undertaken by record companies and/or their foreign distributors or licensees, but rather are assumed by digital service providers like Spotify.

22.    Upon information and belief, digital service providers like Spotify charge a 30% retail distribution fee to cover the marketing, promotion, and distribution of digital music products.

23.     Thus, with respect to streaming and digital income earned outside of the United States, Island Records' foreign affiliates/licensees render virtually no services, have few, if any, costs, and simply serve as the collection agent or conduit for the receipt of passive income.

24.     Given this, Island Records' 40% deduction (on top of Spotify's 30% fee) to distribute the Masters in foreign territories is excessive and not commensurate with the amount of work undertaken by the foreign distributors and/or sub-licensees.

25.     More importantly, such a charge is not contractually permitted.

26.     The provisions in the Recording Agreements which anticipated certain foreign affiliate deductions related to the physical – not digital – distribution of products embodying master recordings around the world, or the active licensing of such master recordings by the foreign affiliates.

27.     There is no express provision in the Recording Agreements authorizing Island Records or its foreign affiliates to take a 40% fee for passively collecting income from digital service providers around the world.

28.     Moreover, the 40% charge is calculated internally and is not based upon an "arm's length transaction" between Island Records and its affiliates and/or licensees.

29.     If there had been an arm's length transaction between Island Records and its foreign affiliates/licensees relating to the collection of streaming income from digital service providers, the appropriate and reasonable fee for such service would not exceed ten percent (10%).

30.     Thus, the 40% foreign distribution charge has been improperly deducted by Island Records in its calculation of royalties due Plaintiff.

31.     Island Records, after receiving Plaintiff's audit report, rejected Plaintiff's contention that it had underreported royalties.

32.     In addition to the underpayments identified in the Audit Report, upon information and belief, Defendant has not properly accounted to or paid Plaintiff its share of income derived from the commercial exploitation of videos embodying the Masters (the "Videos") on video streaming services, including, but not limited to, YouTube and Vevo.

33.     Island Records' books and records of account showed that the Videos were streamed more than 2 billion times. Upon information and belief, the amount of streams generated significant net income in excess of $9.85 million dollars such amount being after deduction of YouTube's platform fees which, upon information and belief, are understood to be approximately 40%. Plaintiff's royalty arising from such net income would be $4.925 million dollars (such amount assuming that no inter-company deduction should correctly be applied to the income received by the Defendant prior to accounting to the Plaintiff).

34.     Notwithstanding the foregoing, based upon an examination of the available data for the Audit Period, the amount of royalty reported was $930,676 (such amount being after deduction of inter-company charges totaling $286,815).

35.     Thus, upon information and belief, Defendant has significantly underreported the amount of revenue it received attributable to the Videos and the amount of royalties due to Plaintiff in connection therewith.

36.     As a result of Defendant's underpayment and miscalculation of royalties payable to Plaintiff with respect to the Masters and the Videos, Defendant is liable to Plaintiffs for damages in an amount of not less than $3.7 million, plus pre-judgment interest thereon, for the Audit Period.

37.     Defendant has failed and refused to pay such amount and cure its breaches of the Recording Agreements as amended, despite Plaintiff's due notice and demand for same.

**The Vevo Claim And Defendant's History of Artist Royalty Payments for YouTube Music Channel Networks**

38.    In addition to the foregoing accounting and payment deficiencies, Defendant's use of Vevo to facilitate the commercial exploitation of Plaintiff's Masters and Videos on YouTube has, in breach of Defendant's covenant of good faith and fair dealing, unfairly and improperly reduced the amount of royalties payable to Plaintiff from the commercial exploitation of Plaintiff's Masters and Videos on YouTube.

*History of YouTube and Vevo*

39.    Founded in 2006, Vevo is a video hosting service that furnishes music videos to YouTube.

40.    Upon information and belief, Vevo was formed as a joint venture between three major record labels Sony Music Entertainment ("Sony"), Warner Music Group ("WMG"), and Universal Music Group ("UMG"), but WMG divested its interest in Vevo such that Sony and UMG (collectively hereinafter the "Labels") are the majority owners of Vevo.

41.    UMG is, upon information and belief, the parent company of Defendant and Defendant is a record label / division of UMG.

42.    Upon information and belief, prior to the formation of Vevo, Sony and UMG each operated its own music channel network ("MCN") on YouTube and was able to directly commercially exploit their respective artists' recordings and music videos on their respective YouTube MCNs pursuant to a direct agreement with YouTube.

43.    Upon further information and belief, under their respective agreements with YouTube, UMG and Sony each collected revenue from YouTube generated by the commercial exploitation of their artists' works on that platform and YouTube provided each of the Labels with a transparent monthly statement of revenues, which accounting was separated by artist and work

title such that a separate accounting was made to each Label for each artist and/or each musical work.

44.     Each of the Labels then accounted to their respective artists for, among other sources of revenue, YouTube income and was able to provide their artists with transparent accountings of YouTube income separated by work title and, in the case of audits, provide back-up documentation (specifically, the YouTube statements to the record labels) to support the artist accountings.

45.     The creation of Vevo by the Labels changed – to the detriment of artists and the advantage of each of the labels – the fundamental structure of the method and amount of YouTube revenue collection by the record labels and their subsequent accounting and payments of such revenues to artists.

46.     Following the creation of Vevo, the Labels furnished their artists' recordings and music videos to Vevo, rather than to YouTube directly, and Vevo, rather than the Labels, uploaded the musical works to YouTube.

47.     In turn, Vevo, rather than the Labels, received both the royalties and the "at source" accountings directly from YouTube that had previously been furnished to the Labels.

48.     Upon information and belief, Vevo deducts a commission for its purported services.

49.     As owners and shareholders of Vevo, UMG and Sony each receive a portion of the commissions received by Vevo in respect of the commercial exploitation of their artists' works – monies that otherwise would have gone to the Labels directly and been paid out and accounted for to artists – but now the Labels do not account for their receipt of such revenues and diminish the amount of revenue paid to their recording artists.

50.     Upon further information and belief, after deducting its commission, Vevo – which is owned by the very record labels to whom Vevo is accounting – pays over its net YouTube income to Sony and UMG.

51.     Upon information and belief, the payments made by Vevo to the Labels are not accompanied by any detailed accounting and are not separated by artist or work title.

52.     Upon information and belief, UMG and Sony have failed and refused to request that Vevo provide them with detailed accountings.

53.     UMG and, upon information and belief, Sony, therefore do not receive from Vevo, and do not provide to their artists, transparent accountings to artists with respect to YouTube income.

54.     Instead, upon information and belief, UMG and Sony pay out YouTube monies received from Vevo to their artists by market share, which has no relation to the actual income earned by each artist or by each work and can result in unjustified underpayments and/or overpayments to artists.

55.     Moreover, in the event of an audit by an artist, the Labels do not possess "at source" documentation to substantiate the YouTube monies paid to the artist.

56.     Thus, rather than autonomously uploading their artists' musical works and music videos to their respective YouTube MCNs and receiving revenues and accountings directly from YouTube and accounting to their artists fairly and transparently, the Labels use Vevo as an unnecessary "straw man" to reduce the amount of royalties payable to their artists and avoid providing their artists with transparent accountings for YouTube income.

### Defendant's Underpayments of YouTube Income to Plaintiff

57.     Upon information and belief, during the Audit Period, Defendant delivered the Videos to Vevo for publication and commercial exploitation on the YouTube platform rather than

uploading the Videos directly to its own YouTube MCN and receiving income directly from YouTube with respect to the commercial exploitation of the Videos.

58.    Upon information and belief, during the Audit Period, the Videos have been streamed billions of times, generating nearly $10 million in net income after platform fees are deducted during the Audit Period.

59.    Upon further information and belief, YouTube accounted and paid royalties to Vevo in respect of its commercial exploitation of Defendant's music videos, including the Videos.

60.    Upon information and belief, Vevo collected such income from YouTube, deducted a significant "commission" therefrom, and remitted the balance of such royalties to Defendant, without any documentation reflecting the specific amount of royalties attributable to any particular video or artist.

61.    Defendant, in turn, only accounted to Plaintiff with respect to a portion of the net monies it received from Vevo and does not have any reporting information to support or explain the amount of its payment, if any, to Plaintiff in respect of its Vevo income.

62.    However, Vevo is, upon information and belief, owned in part by UMG, Defendant's parent company.

63.    Thus, as an owner and shareholder of Vevo, UMG not only has the ability to demand that Vevo provide an accounting breakdown of royalties, but UMG receives a portion of the commissions received by Vevo in respect of the commercial exploitation of its artists' – including the Cranberries – works on YouTube, but does not account for its receipt of such revenues to its artists, thereby diminishing the amount of revenue paid to its recording artists, including the Cranberries.

64.     This conduct undermines the express purpose of the Recording Agreements and, in breach of the implied covenant of good faith and fair dealing inherent in such agreements, frustrates Plaintiff's ability to collect the full benefits of its agreements with Defendant.

65.     In connection with the claims asserted in this proceeding related to the Audit, Plaintiff and Defendant entered into tolling agreements which, as amended, tolled all time limitations, contractual, statutory or otherwise, effective as of September 21, 2021 (thus preserving all claims that accrued during the Audit Period).

## AS AND FOR A FIRST CLAIM
(Breach of Contract)

66.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 65 hereof as though fully set forth herein.

67.     Plaintiff has performed all of the terms, conditions and covenants to be performed by it under and pursuant to the Recording Agreements.

68.     By reason of the foregoing, Defendant has breached and continues to breach its duties and obligations under the Recording Agreements.

69.     As a direct and proximate result of Defendant's breaches of its contractual obligations to Plaintiff, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial, of no less than $1.5 million, plus pre-judgment interest thereon.

## AS AND FOR A SECOND CLAIM
(Breach of Implied Covenant of Good Faith and Fair Dealing)

70.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 69 hereof as though fully set forth herein.

71.     The parties entered into each of the Recording Agreements.

72.     Plaintiff has fully performed all of the terms, conditions and covenants to be performed by it under and pursuant to the Recording Agreements.

73.     Inherent in each of the Recording Agreements is the implied covenant of good faith and fair dealing.

74.     By reason of the foregoing, Defendant has breached and continues to breach its covenant of good faith and fair dealing under the Recording Agreements.

75.     As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing inherent in the parties' Recording Agreements, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial, of no less than $3.7 million, plus pre-judgment interest thereon.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)     On the First Claim, damages in an amount of no less than $1.5 million, plus pre-judgment interest thereon;

(b)     On the Second Claim, damages in an amount of no less than $3.7 million, plus pre-judgment interest thereon;

(c)     the costs of this action; and

(d)     such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 24, 2025

REITLER KAILAS & ROSENBLATT LLP

By: /s/ Brian D. Caplan
       Brian D. Caplan
       Julie B. Wlodinguer
885 Third Avenue, 20th Floor
New York, New York 10022
(212) 209-3050
bcaplan@reitlerlaw.com
jwlodinguer@reitlerlaw.com

*Attorneys for Plaintiff*